IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


JANE DOE                        *
                                *
                                *
v.                              *   Civil Action No. WMN-11-1399
                                *
                                *
O.C. SEACRETS, INC. et al.      *
                                *
   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

**MEMORANDUM**

Before the Court is a motion for summary judgment filed by

Defendant O.C. Seacrets, Inc. (Seacrets or Defendant) ECF No.

33.[1]  The motion is fully briefed.  Upon review of the briefs,

exhibits, and applicable case law, the Court determines that no

hearing is necessary, Local Rule 105.6, and that the motion will

be denied.

**I. FACTUAL BACKGROUND**

Defendant Seacrets operates the largest bar/entertainment

complex in Ocean City, Maryland.  It is located at 117 W. 49th

Street, which is at the end of West 49th Street.  At the time of

the events giving rise to this action, the bar had a capacity of

3500 to 4000 persons and on a summer holiday weekend would have

---

[1] A second defendant, Leighton W. Moore, also filed a motion for
summary judgment.  ECF No. 32.  Plaintiff subsequently moved to
voluntarily dismiss the claims against Defendant Moore.  ECF No.
41.  Plaintiff's motion to dismiss will be granted and Moore's
motion will be denied as moot.

several thousand patrons.  This case arises from the brutal assault and rape suffered by Plaintiff after she was ejected from Seacrets in the early morning hours of May 24, 2008.

In some respects, the evidentiary record provides substantial information regarding the events leading up to Plaintiff's attack.  The area in and around Seacrets is monitored by 128 security cameras and video images from those cameras, along with cell phone records of calls placed by and to Plaintiff, provide a general timeline regarding the movement of Plaintiff and those around her.  Unfortunately, there is a critical period of about 30 minutes immediately prior to the attack where Plaintiff's whereabouts are not shown by the security cameras.  In addition, there is no audio attached to the video recordings and the quality of the surveillance tapes leaves many questions unanswered.  Most significantly, however, reconstructing what occurred is hampered by the fact that Plaintiff, either as a result of her level of intoxication or because of the trauma of the attack, has no memory of any of the critical events.  In addition, none of the employees of Defendant who interacted with Plaintiff that morning have any independent recollection of those interactions with Plaintiff.[2]

---

[2] While it perhaps makes no difference, Plaintiff's counsel waited until the very last day before the running of the three year statute of limitation to file this action.  Thus,

What is known about the events of the early morning hours of May 24, 2008, follows.

Plaintiff and four of her girlfriends, Jaslyn Kraemer, Diana Branco, Crystal Lamb, and Rebecca Brady, travelled from Pennsylvania to Ocean City, Maryland to celebrate the Memorial Day weekend.  They were to be joined on Saturday morning by another friend, Jack Callahan.  After checking into their hotel on the afternoon of May 23, the five friends unpacked and, late in the evening, decided to go to Seacrets.  Plaintiff had been to Seacrets on one prior occasion during the day, but was not familiar with the layout of the facility.  None of her friends had been to Seacrets previously.

The friends decided to walk the five blocks from their hotel to Seacrets.  One of Seacrets' security cameras shows them arriving at 11:06 p.m.  They initially went to a "tiki bar" segment of the facility where a reggae band was playing loudly. Plaintiff ordered a Red Bull and vodka drink and then went for a walk around the facility with Branco.  Plaintiff has no memory of anything after this point.

Branco testified that she and Plaintiff rejoined their friends at the tiki bar.  Shortly after 1:00 a.m., Plaintiff handed her purse to Lamb and moved away from the group, carrying

depositions were taken three and a half years after the event the deponents were asked to recall.

with her just her cell phone and three dollars.  The hotel room
key that Plaintiff had taken with her to Seacrets was in her
purse along with the rest of her cash.  Plaintiff's friends were
aware that Plaintiff had missed a telephone call from her then
boyfriend, Phillip Kibby, and assumed that she was going to a
quieter place to return the call.  Her friends were also aware
that Plaintiff was intoxicated.  See Lamb Dep. at 18.[3]

   At about 1:04 a.m., a security camera in another part of
Seacrets captures Plaintiff visibly swaying and staggering.  She
then actually falls sideways to the floor at the feet of one of

---

[3] While Defendant notes that Plaintiff's friends were not
"concerned" about her level of intoxication, ECF No. 33-1 at 2,
it appears that Lamb's testimony was more of a reflection of her
reluctance to place a moral judgment on Plaintiff's intoxication
than the expression of an opinion concerning Plaintiff's
wellbeing at the time.  See Lamb Dep. at 18 (Lamb testified, "I
wasn't – no, I wasn't concerned.  I mean, she was intoxicated,
but I wasn't concerned.  Like, concerned means like it would be
a bad thing.").  In its Reply memorandum, Defendant also argues
that Branco and Brady "testified that Plaintiff was not
intoxicated to the point that they were concerned about her
safety."  ECF No. 40 at 16.  Branco testified that she knew
Plaintiff was intoxicated and when asked why she was not
concerned, responded, "I'd be concerned if she was, like,
falling all over the place and couldn't walk . . . .  Then I
would be concerned."  Branco Dep. at 40.  As detailed below,
that is exactly what Plaintiff was doing.  Furthermore, Callahan
testified that after speaking with Branco on the telephone, he
concluded that Branco was "pretty intoxicated," Callahan Dep. at
19, and thus, her assessment of Plaintiff's condition is of
limited value.  As for Brady, the exhibit cited by Defendant in
its Reply brief is Lamb's deposition, not Brady's.  ECF No. 40
at 16 (citing Ex. C).  Exhibit E to Defendant's Reply is a page
from Brady's deposition but it make no reference to concern or
lack of concern for Plaintiff's wellbeing.

Defendant's employees, William Arvin.  Arvin helps Plaintiff to
her feet and they appear to talk briefly.  Plaintiff stands near
several Seacrets employees for a few minutes and continues to
sway and would have fallen again several times if not caught by
the Seacrets staff.  Arvin and another employee escort Plaintiff
out of the bar.  A finder of fact could readily conclude upon
reviewing the video footage that Plaintiff was highly
intoxicated at this point in time.

Although Arvin has no independent recollection of
interacting with Plaintiff that evening, upon review of the
videotape, he confirms that he would have been ejecting
Plaintiff from the bar for being too intoxicated.  In order to
maintain its license to sell alcoholic beverages, Seacrets is
required to eject patrons who are intoxicated.  Worcester County
Alcoholic Beverage License Rules and Regulations 32.D.9
(providing that an establishment's alcoholic beverage license
can be suspended or revoked if the establishment "permit[s] any
intoxicated or disorderly person to remain or loiter on the
licensed premises").  Consistent with that regulation, Seacrets
has adopted policies and trains its staff concerning the
ejection and refusal to readmit intoxicated patrons.  Plaintiff
concedes she was intoxicated and does not challenge Defendant's
decision to eject her from the premises.

After escorting Plaintiff out of the bar area, Arvin left Plaintiff with another Seacrets employee, Corey Dietrich. Dietrich stood with Plaintiff from about 1:08 a.m. until 1:11 a.m. when he began to escort her through a rope barrier to an area outside the main entrance to the complex.  This exit is referred to as the "White Gates" exit.  By 1:15 a.m., Dietrich had taken Plaintiff to a bench where they sit down together briefly.  Dietrich stands up at 1:16 a.m. but remains in close proximity to Plaintiff until 1:22 a.m., when he begins to walk away.  Plaintiff's cell phone records indicate that while Dietrich was with her at the bench, Plaintiff made a call to Kraemer at 1:16 a.m., and received a four minute call at 1:17 a.m. from her then boyfriend, Kibby, who was in Pennsylvania.[4] Videotape from inside Seacrets shows Kraemer dancing next to the stage when the call would have been placed and thus it must be assumed that the call to her simply went to her voicemail.

After Dietrich departs but while Plaintiff remains sitting on the bench, Plaintiff's phone records indicate that she receives a phone call from Branco, and makes a one minute phone call to Kibby.  Despite the phone records that indicate a call

---

[4] Defendant erroneously identifies this 1:17 a.m. call as a call made by Plaintiff.  ECF. No. 33-1 at 8.  The phone records, however, clearly show it as an incoming call.  Ex. O to Seacrets' Motion.

from Branco, videotape from inside Secrets shows Branco standing
near the band neither speaking into nor listening to her phone.

Kibby, however, does remember speaking to Plaintiff that
morning, but his testimony about his conversation (or
conversations) with her is somewhat confusing.  At one point in
his deposition, Kibby states that he called Plaintiff, she did
not answer, and then she called back and was crying and saying
that she is outside of Seacrets, they will not let her back in
the bar, and her belongings are inside with Lamb.  Kibby Dep. at
12.  Later in his deposition, after being told that the phone
records show two calls, he states, "I remember having a
conversation with her.  If I had a conversation with her the
first time and then she called me back – I remember the second
one saying she could not get in, they would not let her back in
the bar."  Id. at 18 (emphasis added).  When asked about the
first conversation, he testified it was a casual conversation:
"'H[e]y, how are you doing?  How is your night.'"  Id. at 18.

Plaintiff argues in her opposition that Dietrich was close
to Plaintiff during the phone call in which she was crying "so
he knew from hearing her conversation with Kibb[y] that
Plaintiff had been unable to reach her friends inside the bar or
retrieve her belongings."  ECF No. 39 at 13.  Defendant argues
that Dietrich would have only overheard the casual conversation

in which Plaintiff raised no concerns.  ECF No. 40 at 12.  Given
that Kibby was deposed more than three years after the
conversation(s) he is being asked to remember, it is not
surprising that he is less than certain about the details.
Regardless, it is not clear from Kibby's deposition testimony
what Dietrich may have overheard.

At about 1:27 a.m., Plaintiff stands up and walks towards
two police officers who were standing ten or fifteen feet from
the bench on which she was sitting.  The police officers appear
to be in the process of placing a handcuffed individual in a
patrol wagon.  She stands near them briefly, and then sits back
down on the bench at about 1:28 a.m.  At about 1:31 a.m.,
Plaintiff stands up again and walks around in the vicinity of
the benches for about a minute.  She still appears to be
stumbling and very unsteady.

At about 1:33 a.m. an unknown male approaches the bench on
which Plaintiff is sitting and sits down next to her.  After
several minutes pass, at about 1:41 a.m., Dietrich walks over to
the bench, leans over to Plaintiff and appears to be talking to
her for about 22 seconds.  Dietrich then walks away.

About two minutes later, the unknown male stands but
remains close to the bench.  Plaintiff then stands about half a
minute later and at about 1:44 a.m. the two walk down 49th

Street, away from Seacrets and towards the main highway.  The
unknown male appears to be supporting Plaintiff as they walk.
As they walk away, Dietrich is standing about 15 to 20 yards
away with other Seacrets employees and is facing in the general
direction of Plaintiff and the unknown male.  Plaintiff's
whereabouts for the next thirty minutes is unknown.[5]

Plaintiff does make and receive cellphone calls during that
thirty minute period.  At 1:56 a.m., Lamb called Plaintiff.[6]
Lamb testified, however, that due to the noise, she was unable
to hear what Plaintiff was saying beyond the fact that she was
outside of Seacrets.  Lamb Dep. at 23.  Lamb told Plaintiff that
she would be out to meet her as soon as she could.  Plaintiff
called Lamb at 2:11 a.m. and then called Jack Callahan at 2:12.
There is nothing in the record concerning the second call to
Lamb.  Callahan does recall receiving this call and describes it
as "a fairly normal conversation" in which they talked about him
coming down the next day.  Callahan Dep. at 14.  While Plaintiff

---

[5]  In the Amended Complaint, Plaintiff states, "upon information
and belief, Plaintiff [] attempted to make her way back to her
hotel room, where she thought her friends may have returned, but
she did not have the key because her belongings were still with
her friends in Seacrets."  Am. Compl. ¶ 16.  In that her hotel
was about five blocks from Seacrets, that surmise would be
consistent with a thirty minute absence.

[6] Defendant represents that this was a call made by Plaintiff to
Lamb.  ECF No. 33-1 at 10.  The phone records indicate that this
was an incoming call.

conveyed that she was outside Seacrets, nothing she said gave him any concern.  Id. at 14-15.

At about 2:15 a.m., Plaintiff comes back into the view of the same surveillance camera outside the White Gates exit which showed her departure thirty minutes earlier.  As she walks towards Seacrets, she passes through a parking lot at 111 W. 49th Street (the 111 Lot) onto a parking lot at 113 W. 49th Street (the 113 Lot).  The 111 Lot is a parking lot used by Seacrets' patrons.  The 113 Lot is used by those staying in the Kona Bay Condominiums, which are immediately adjacent to Seacrets.  After passing through the 113 Lot, Plaintiff passed to the left of a parked Ocean City Police car and large pontoon boat sitting at 115 W. 49th Street. The boat was part of a Seacrets promotional giveaway.  Although on the other side of the pontoon boat, Plaintiff was within a few yards of the bench on which she earlier sat.

Plaintiff is followed through the parking lots by a second unknown male.  He catches up to Plaintiff at about 2:16 a.m. while she is standing in front of 113 W. 49th Street, and behind the pontoon boat.  This second unknown male (the assailant) is the individual who ultimately assaulted and raped Plaintiff.

Shortly after the assailant caught up with Plaintiff, she receives a telephone call from Callahan at 2:17 a.m.  Unlike the

call a few minutes earlier, in this call Plaintiff is very upset
and crying.  Callahan can hear a man with a foreign accent in
the background and Plaintiff is asking him to leave her alone.
Plaintiff is sounding more and more frightened.  This call
lasted about four minutes but, after a point, Plaintiff stopped
responding to Callahan's questions and he then heard a noise
that sounded like the phone was dropped or taken away and then
the phone went dead.

At about this same time, Plaintiff's friends are being
ushered out through an exit on the other side of the complex,
hundreds of yards from where Plaintiff was located.  Seacrets
officially closes at 2:00 but Defendant acknowledges it takes
some time to clear out the facility.  A security camera shows
Plaintiff's friends exiting at 2:18 a.m.  As they are exiting,
the women tell a Seacrets employee that they are looking for
their friend and he responds, "she probably just met up with
some friends, go home, she'll meet you there."  Kraemer Dep. at
50.  Concerned for Plaintiff's safety, Callahan calls Kraemer
and Branco to tell them to try to find Plaintiff but testifies
that they were "pretty intoxicated," so he "wasn't getting
anywhere with them."  Callahan Dep. at 19.  Callahan also called
Lamb who he described as "pretty sober."  Id.  He told Lamb,
"you need to call the police and find [Plaintiff], you know,

11

something is wrong." Id. at 21.  Lamb tried unsuccessfully to call Plaintiff.  The friends stand in the parking lot onto which they exited for about a half an hour and then they walk back to their hotel assuming that they would find Plaintiff there.

While her friends were exiting on the other side of the complex, Plaintiff remains standing with the assailant in the corner of the 113 Lot for several minutes.  While they are standing there, at 2:18 a.m., an Ocean City policeman returns to the parked police car by which Plaintiff just walked.  He turns on his emergency lights and drives off a few seconds later.  Plaintiff opines that the policeman could not have seen her or the assailant as the view was blocked by a parked SUV and the pontoon boat.

At about 2:19 a.m., Plaintiff and the assailant move to the other side of the 113 Lot and stand next to a white Honda.  In the view of Plaintiff's counsel, the videotape shows a "flurry of activity between Plaintiff and her attacker which is consistent with a violent assault" which begins around 2:22 a.m. ECF No. 39 at 17.  Police later find blood stains on the white Honda and Plaintiff's shoes and an earring on the ground near the vehicle.

At about 2:26 a.m., the assailant briefly leaves Plaintiff and circles around behind the structure at 113 W. 49th Street.

During the approximately one minute that he is away, a third unknown male walks by the place where Plaintiff was left, stops for about eight seconds and then continues walking.  The assailant returns to Plaintiff and, at about 2:28 a.m., he and the Plaintiff are seen moving behind the building at 113 W. 49th Street.  It is behind that building that Plaintiff is raped.

Based upon this series of events, Plaintiff asserts two distinct causes of action against Seacrets in her Amended Complaint.  In Count One, Plaintiff asserts a claim of "Negligent Ejectment."  Again, Plaintiff does not deny that Seacrets had the right, if not the obligation, to eject her because of her level of intoxication.  Instead, Plaintiff posits that, once Seacrets ejected her, there arose a duty derived from various sources under which Defendant was required to make reasonable efforts to reunite her with her friends and belongings.  In Count Two, Plaintiff asserts a claim of "Premises Liability."  While the 113 Lot might not technically have been a part of Seacrets' premises, Plaintiff contends that, because Seacrets voluntarily undertook to provide security for the 113 Lot, it can be held liable for failing to properly perform that assumed duty.  Seacrets has moved for summary judgment as to both claims.

**II. LEGAL STANDARD**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party must demonstrate through the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that a reasonable jury would be unable to reach a verdict for the non-moving party.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  When this burden is met, the non-moving party then bears the burden of demonstrating that there are disputes of material fact and that the matter should proceed to trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

A material fact is one that "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  Id. at 249.  Further, the court must construe the facts in the light most favorable to the party

14

opposing the motion.  See United States v. Diebold, 369 U.S.
654, 655 (1962); In re Apex Express Corp., 190 F.3d 624, 633
(4th Cir. 1999).

## III. DISCUSSION

The Court initially notes that, while Seacrets in its
motion suggests that Count I simply duplicates Count II, see ECF
No. 33-1 at 20, Plaintiff's two causes of action are separate
and distinct and primarily relate to two different periods of
time.[7]  The acts or omissions of Seacrets employees upon which
Plaintiff bases her negligent ejectment claim are those actions
taken or not taken before the thirty minute period in which
Plaintiff's whereabouts were unknown.  If those acts or
omissions gave rise to a claim of negligent ejectment, Seacrets
would be liable under that claim had Plaintiff never returned to
the vicinity of Seacrets but was attacked at some other
location.  In contrast, Plaintiff's premises liability claim in
Count II looks primarily at the acts or omissions of Seacrets
employees from the time she returned to the vicinity of Seacrets

---

[7] Seacrets also suggests that Count I is a veiled attempt to
bring a dram shop claim.  Id. at 19 - 20.  Dram shop liability
provides relief for plaintiffs who are injured as a result of a
defendant's sale of alcohol.  Troxel v. Iguana Cantina, LLC, 29
A.2d 1038, 1047 (Md. Ct. Spec. App. 2011).  Dram shop liability
is not recognized under Maryland law.  Id.  Here, Plaintiff's
negligence claim is not premised on Seacrets' sale of alcohol
but the manner in which she was ejected from the premises.

until she was pulled behind the building on 113 W. 49th Street. For Seacrets to be liable under this second claim, Plaintiff's status as one who had been ejected from the complex is not critical.  If there is liability under this theory, a patron could recover if she had been ejected from Seacrets or simply exited voluntarily.

With that distinction in mind, the Court will examine each claim separately.

### A. Negligent Ejectmnt

While Defendant argues that there is no cause of action in Maryland for negligent ejectment, the claim is essentially just a negligence claim framed in a particular context.  To establish a claim of negligence under Maryland law, a plaintiff must show: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached the duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty."  Shields v. Wagman, 714 A.2d 881, 884 (Md. 1998) (internal quotations omitted).  Defendant challenges Plaintiff's ability to establish each of these elements except the third, i.e., that she suffered actual injury.

### 1. Duty to Use Reasonable Care When Ejecting Customers

16

To establish a duty owed to her in this context, Plaintiff cites three sources.  First, Plaintiff points to the "affirmative conduct" on the part of Defendant of ejecting her. She argues that while there is "no duty to come to the assistance of a person in difficulty or peril there is at least a duty to avoid affirmative acts making his situation worse," and that by separating her from her friends and belongings, Defendant made her situation worse.  ECF No. 39 at 19 (quoting Furr v. Spring Grove State Hosp., 454 A.2d 414, 420 (Md. Ct. Spec. App. 1983)).  Plaintiff also finds support from Prosser and Keeton for a duty in this context arising from a defendant's affirmative conduct:

> There may be no duty to take care of a man who is ill
> or intoxicated, and unable to look out for himself;
> but it is another thing to eject him into the danger
> of a street or railroad yard; and if he is injured
> there will be liability.  But further, if the
> defendant does attempt to aid him, and takes charge
> and control of the situation, he is regarded as
> entering voluntarily into a relation which is attended
> with responsibility.

Id. (quoting W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 56 at 378 (5th ed. 1984)).

While this Court is aware of no Maryland decision addressing the duty based upon the affirmative act of ejecting a bar patron, courts in other jurisdictions have recognized such a duty arising out of general negligence principles.  In

17

Cunningham v. Happy Palace, Inc., 970 P.2d 669 (Or. Ct. App. 1998), a bar patron who had been driven to the bar by her daughter and dropped off became very intoxicated.  While the plaintiff was waiting in line to make a telephone call, presumably to call her daughter to get a ride home, a bouncer employed by the defendant told her she had to leave the bar and escorted her outside.  The bouncer did not permit her to make a telephone call, nor did he arrange for a cab to take her home. The plaintiff began hitchhiking home and was picked up by three men who drove her to a remote location and raped her.

Like Defendant here, the defendant in Cunningham argued that it could not be held responsible for injuries suffered by the plaintiff as a result of her voluntary intoxication. Plaintiff countered that she was not arguing simply that her intoxication made her injury foreseeable but rather, "when defendant affirmatively acted to eject her from the premises and thereby prevented her from securing safe passage home, defendant set in motion the events that led to her injury."  Id. at 671. The trial court granted the defendant's motion on the plaintiff's negligent ejectment claim.

Reversing that decision, the Oregon Court of Appeals held, "[t]he dispositive issue in this case is whether, by forcing plaintiff to leave the bar before she could telephone her

18

daughter for a ride home, it was foreseeable that defendant was placing plaintiff in harm's way.  If it were reasonably foreseeable that plaintiff would come to harm as a result of criminal acts by others, then defendant can be held liable for that harm." Id. at 671.  See also, Sinisgalli v. O'Rourke, 51 Conn. Law Rptr. 137, 2010 WL 5493495 at *2 (Conn. Super. Ct. 2010) (holding that tavern owner had a duty to take "reasonable steps not to injure [plaintiff] or place her in a situation of foreseeable risk of being injured as part of the ejection process"); Thrasher v. Leggett, 373 So.2d 494, 497 (La. 1979) (holding that bar owner has a duty to avoid affirmative acts which increase the peril to an intoxicated patron but, in the case before it, finding that this duty was not breached).

As a closely related basis for imposing a duty on Seacrets in this context, Plaintiff points to the Restatement (Second) of Torts § 314A and the general duty of business owners owed to business invitees.  Section 314A provides:

> (1) A common carrier is under a duty to its passengers to take reasonable action
>
> (a) to protect them against unreasonable risk of physical harm, and
>
> (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
>
> (2) An innkeeper is under a similar duty to his guests.

(3) <u>A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation</u>.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

Restatement (Second) of Torts, § 314A (emphasis added).

Maryland courts have expressly adopted § 314A as Maryland common law. <u>See</u> <u>Southland Corp. v. Griffith</u>, 633 A.2d 84, 91 (Md. 1993) ("we adopt § 314A of the Restatement, and in particular embrace the proposition that an employee of a business has a legal duty to take affirmative action for the aid or protection of a business invitee who is in danger while on the business's premises, provided that the employee has knowledge of the injured invitee and the employee is not in the path of danger").

At least one court has applied Section 314A(3) to impose a duty on tavern owners "to exercise reasonable care and to take reasonable action as to their patrons, including a general duty to exercise reasonable care in ejecting [the plaintiff] from [their establishment]." <u>Hoff v. Elkhorn Bar</u>, 613 F. Supp.2d 1146 (D.N.D. 2009). In <u>Hoff</u>, a bar patron became so intoxicated that he was unable to keep his balance and fell on several occasions in the bar. After he became disruptive, he was ejected from the bar into sub-zero weather wearing only a light

coat.  The ejected patron began to walk away from the bar, slipped and fell, striking his head on the pavement and subsequently died of injuries sustained in the fall.  In denying the defendant tavern's motion for summary judgment, the federal district court held that there was a genuine dispute of fact as to whether the defendant exercised reasonable and ordinary care in ejecting the plaintiff and whether injury or death was foreseeable as a result of the ejection.  Id. at 1160.

Plaintiff argues that a third source of a duty owed to her by Seacrets is found in Seacrets' own policies regarding the treatment of intoxicated patrons.  Seacrets is an establishment that frequently has to eject patrons for high levels of intoxication, sometimes as many as 40 customers a night.  Arvin Dep. at 10.  Due perhaps to the frequency of those ejections, Seacrets has developed a detailed policy regarding how those ejections are to be handled.  In many respects, Seacrets' policy simply reflects the duty flowing from the two sources cited above.

According to Corey Dietrich, the Seacrets door staff person who interacted most with Plaintiff, Seacrets trains its employees "to do everything possible to get ejected patrons home safely."  Dietrich Dep. at 27.  Seacrets corporate designee, Scott Studds, elaborated on Seacrets' policies regarding ejected

patrons: "basically, the main policy is exhaust every option of
what you can do to help this person."  Studds' 10/7/2012 Dep. at
10-11.  Seacrets staff will call cabs for patrons and, if the
patron is a woman, will only put them in a cab where they know
the driver or the driver is a woman.  Id.  If someone is ejected
and then seen "leaving with someone that we're not sure that
they know . . . [n]ames are taken down, ID's are checked again.
. . .  If it's someone [] that we see walk out and we're not
convinced they're with that person, we'll check into it. . . .
[W]e try to determine that these people are together; in fact,
they know each other; they didn't just meet; that type of
thing."  Id. at 13-14.  Seacrets expects its door staff to "be
of as much assistance as possible" to those patron who are
ejected.  "[T]o make sure that these people are getting home
safe . . .  you need to check who they're leaving with. . . ."
Id. at 57.

Regarding reconnecting the ejected patron with the rest of
his or her party, Seacrets staff is instructed to "exhaust every
option."  Id. at 15.  If the friends are not with the patron
when it is determined that he or she should be ejected, Seacrets
staff will get a description of the friends and search the

property.  Arvin Dep. at 26.[8]  If the initial search is
unsuccessful, staff members are trained to put the names and
descriptions of the friends out to the radios that are carried
by all Seacrets staff.  Studds 10/7/2011 Dep. at 16.  In
addition, if patrons have cellphones but are not in a condition
to use them, Seacrets staff will look for "in case of emergency"
numbers or last called numbers and call those numbers in an
attempt to alert the rest of the party that their friend has
been ejected from the complex.  Id. at 11.  Finally, if patrons
ask a question as to where a friend from whom they have been
separated might be, staff are told to "direct these people out
front of the white gates exit because that's the main area where
people who are waiting will be waiting, on the benches."  Coley
Dep. at 25-26.

Plaintiff argues that by voluntarily adopting policies
directed at assisting ejected patron to safely reconnect with
their party or otherwise safely return to their lodgings,
Seacrets is liable if it fails to follow those policies.
Plaintiff suggest that imposing liability on this basis is
particularly appropriate where police officers who patrol the
area around Seacrets and who were present at the time Plaintiff

---

[8] Defendant's head of security, Steve Coley, testified that door
staff are not expected to search for an ejected individual's
party still inside the complex.  Coley Dep. at 28.

was ejected are familiar with Seacrets' policies.  There is at least some evidence in the record that if police officers see a Seacrets staff person interacting with an intoxicated individual, the police "will just let Seacrets try to handle their own problems."  Deposition of Sergeant Douglas Smith at 30.

     The Court concludes that Seacrets clearly had a duty to use reasonable care not to place Plaintiff in a position of foreseeable risk when it ejected her from its premises.  That duty arose both from Plaintiff's status as a business invitee on Seacrets' premises and from Seacrets' affirmative conduct that potentially worsened her situation.  The Court views Seacrets' purported policies not so much as an additional source of that duty, but more as an expression of what reasonable care might be in this circumstance.

### 2. Breach of Duty

     It is also clear from the record that a reasonable jury could conclude that Seacrets breached its duty.  Both Arvin and Dietrich observed Plaintiff in a highly intoxicated state.  She fell to the floor right in front of them and clearly would have fallen several more times if not caught by Seacrets staff.  She is still visibly stumbling and swaying even as she walks down

49th Street and appears to be relying on the first unknown male to keep her upright.

A jury could conclude that, despite Plaintiff's highly intoxicated state, Seacrets followed none of the policies it purports to have adopted for the safety of ejected customers.  A jury could conclude that Seacrets made no effort to find Plaintiff's friends to alert them that she had been ejected.  A jury could conclude that neither Dietrich nor any other Seacrets employee made any effort to follow the policy of confirming that the first unknown male was actually someone known by Plaintiff. If Dietrich's 22 second interaction with Plaintiff was his attempt to follow that policy, it was neither thorough nor effective.  In addition, contrary to Seacrets' announced policy, Seacrets door staff that interacted with Plaintiff's friends as they exited did not instruct them to look for Plaintiff at the benches outside the White Gates exit.[9]

Seacrets attempts to factually distinguish the case at bar from cases like Cunningham and Hoff.  While Seacrets may be correct that its conduct was not as egregious as that of the

---

[9] Defendant posits that "Plaintiff has offered no legally [sic] evidence to dispute that Defendant followed its policy on the night in question."  ECF No. 33-1.  From that purported lack of evidence, Defendant argues that the only possible inference is that the policies were followed.  Id.  To the contrary, there is considerable evidence from which a jury could conclude that Seacrets did not follow its own policies.

defendants in <u>Cunningham</u> or <u>Hoff</u>, a jury could still conclude that Seacrets' conduct was unreasonable under the circumstances. A jury might conclude, as Defendant suggests, that because Plaintiff had her cellphone and thus the potential to contact her friends Dietrich had no further responsibility to see to her safety.  That is certainly a factor to be considered in evaluating the reasonableness of Seacrets' response.  But the Court finds it is not determinative.  The jury might determine that a reasonable response would have included confirming that Plaintiff had been able to use the phone to make arrangements to reconnect with her party.

Seacrets also argues that Plaintiff failed to provide expert testimony in support of her negligent ejectment claim, declaring that "Plaintiff's proffer of 'expert' testimony that an individual in her condition is at a higher risk for victimization of crime is without foundation."  ECF No. 40. Seacrets also complains that Vicky Martin, a 26-year veteran of the Ocean City Police Department, was not identified as an expert and thus the Court cannot consider her testimony that a highly intoxicated woman separated from her friends and belongings after being ejected would "absolutely" be at a higher risk of criminal victimization.  Martin Dep. at 48.  On this particular point, the Court finds expert testimony unnecessary.

Seacrets' own policies, particularly as articulated by Studds, reflect the common sense notion that a highly intoxicated woman, alone and out on the streets late at night, faces a threat of victimization.

### 3. Proximate Causation

Under Maryland law, there are two subparts to the element of proximate cause: "cause in fact" and "legal cause" of the injury. <u>Royal Ins. Co. of America v. Miles & Stockbridge, P.C.</u>, 133 F. Supp. 2d 747, 757 (D. Md. 2001). A defendant's negligence is a cause in fact of the plaintiff's injury when the injury would not have occurred "but for" the defendant's conduct. <u>Id.</u> "Legal causation is established if, at the time of the tortfeasor's negligent act, the tortfeasor should have foreseen the general field of danger, not necessarily the specific kind of harm to which the injured party would be subjected as a result of the defendant's negligence." <u>Id.</u> (internal quotations omitted).

Here, a jury could reasonably conclude that Plaintiff would not have been attacked had Defendant followed its procedures and did more to facilitate Plaintiff reconnecting with her friends. Furthermore, it could conclude that Defendant should have foreseen the kind of harm that befell Plaintiff. As noted above, Seacrets' policies as well as common sense recognize the

potential harm to an intoxicated individual, particularly a young woman, left without any means by which to safely return to her hotel.

Defendant suggests that the criminal act of the assailant was a superseding cause of Plaintiff's injury, making any dispute of facts regarding Defendant's negligence irrelevant. ECF No. 33-1 at 34.  That argument fails for the same reasons. While the subsequent intentional tort or crime of a third party can break the chain of causation and relieve a negligent actor from liability, such an intentional tort or crime does not do so when the actor at the time of his negligent conduct realized or should have realized that his negligent conduct could create a situation which offered an opportunity to the third party to commit such a tort or crime.  Tucker v. KFC Nat'l Mgmt. Co., 689 F. Supp. 560, 564 (D. Md. 1988) (citing Restatement (Second) of Torts § 448).

### B. Premises Liability

The viability of Plaintiff's premises liability claim in Count II is a close call.  Plaintiff's claim is premised on the conclusion that the assailant's attack on Plaintiff was initiated on Lot 113.  Plaintiff further posits that, while Lot

113 is not a part of the Seacrets entertainment complex,[10] Seacrets voluntarily assumed responsibility for providing security for the parking lots in the vicinity of the complex, including Lot 113.  Plaintiff then concludes that Defendant's improper performance of that voluntary act was the proximate cause leading to the attack.

Defendant first questions whether the attack was initiated on Lot 113 as claimed by Plaintiff or was initiated instead behind the building on 113 W. 49th Street where Plaintiff was eventually raped.  The distinction is significant in that Plaintiff seems to concede that Defendant did not assume responsibility for providing security in the area behind that building.  Defendant suggests and the Court would concur that the poor quality of the video image and the distance of Plaintiff and the assailant from the security camera makes it difficult to conclude that a "[v]ery fast and violent assault" took place when and where Plaintiff argues it did.  While there were several individuals in the vicinity of the alleged attack, there is no visible sign that anything drew their attention to

---

[10] Evidence submitted with Defendant Moore's motion for summary judgment establishes that the condominium buildings along with the common elements of 113 W. 49th Street were owned by Moore and at the time of this incident were leased to Seacrets.  See ECF No. 32 at 1-2.  While the condominiums were leased by Seacrets, the parties seem to agree that this property was not part of the entertainment complex.

Plaintiff or the assailant.  While there is no audio to the recording, from the lack of reaction of people nearby, it does not appear that there were any screams or noise associated with the attack.  Also, that the third unknown male walked by Plaintiff and appears to have had some interaction with her but then just walks away, seems inconsistent with the conclusion that she had already been brutally attacked.

Notwithstanding, Plaintiff points to the blood found on the Honda in Lot 113 and her shoes and earring found nearby as evidence that she was initially attacked at that location.  The Court, drawing inferences in Plaintiff's favor as it must at this stage in the litigation, concludes that a jury could find that the attack commenced on Lot 113.

Seacrets does not contest that it voluntarily assumed some responsibility for providing security for the parking lots surrounding its facility, including Lot 113.  Coley, Seacrets' head of security, testified that it is Seacrets' practice to have four employees stationed outside the White Gates exit and near the benches from about 1:00 a.m. until the time that most patrons have exited the bar.  Coley Dep. at 37-39.  He further testified that there often is an additional presence of security personnel in the area.  Id. at 43-44.  These staff persons are to "make efforts to maintain visibility" in the surrounding

parking areas, including Lot 113, and "[e]verywhere, their surrounding areas, they should have a good idea of what's going on."  Studds 3/1/12 Dep. at 51.  If any of these employees detected a security incident in the 113 Lot, they would be expected to intervene or otherwise react.  Coley Dep. at 41. While Seacrets officially closes at 2:00 a.m., it generally takes 15 to 30 minutes for the bar and parking lots to clear and security staff generally remain in position until the lots are cleared and the employees are recalled into the facility by their supervisors.  Id. at 39.

One could interpret these policies as Seacrets voluntarily undertaking to monitor Lot 113 and to intervene when necessary. Under Maryland law, "even if no duty existed to employ the particular level of security measures provided by the defendants, improper performance of such a voluntary act could in particular circumstances constitute a breach of duty."  Scott v. Watson, 359 A.2d 548, 555 (Md. 1976).  Seacrets does not contest that general principle of law but maintains that this duty extends only to business invitees.  ECF No. 40 at 16.  When Plaintiff walked back towards Seacrets and entered Lot 113 after having been somewhere else for 30 minutes, it was more than an hour after she had been ejected and 15 minutes after Seacrets officially closed.  On that basis, Seacrets concludes that her

status was that of a trespasser or, at most, a bare licensee.
As a trespasser, the duty owed to her under Maryland law would
be limited.  To a trespasser, "[n]o duty is owed, except to
refrain from willfully or wantonly injuring or entrapping the
trespasser."  Wagner v. Doehring, 553 A.2d 684, 687 (Md. 1989).
If a licensee, the duty owed to her would also be limited: the
only duty owed is "to refrain from willful or wanton misconduct
toward [her] or to use reasonable care to avoid injury if and
when it was discovered that [s]he was in danger."  Ortiz v.
Greyhound Corp., 275 F.2d 770 (4th Cir. 1060).

Seacrets relies on the Maryland Court of Appeals decision
in Levine v. Miller, 145 A.2d 418 (Md. 1958), for the
proposition that "'[a] business visitor ceases to be such after
the expiration of a reasonable time in which to accomplish the
business purpose of the visit.  Whether he becomes a trespasser
or bare licensee, depends upon whether the possessor does or
does not express consent to his remaining thereafter.'"  ECF No.
33-1 at 24 (quoting 145 A.2d at 421).  In Levine, a girl was
granted permission to use a recreation room in an apartment
complex managed by defendant for a specific period of time.  She
returned to the room several hours later without the knowledge
or permission of the defendant and was injured.  The Court held
that upon re-entering the room, she exceeded her permissive

32

invitation and thereby became a trespasser or, at the most, a licensee to whom the owner owed no duty except to abstain from willful or wanton misconduct and entrapment.  145 A.2d at 421.

In Bass v. Hardee's Food Systems, Inc., 982 F. Supp. 1041 (D. Md. 1997), however, this Court held that the question as to whether an individual retains invitee status after leaving and then returning to the defendant's property is generally a question for the jury.  In Bass, the plaintiff bought food at one of defendant's Roy Rogers restaurants and then walked to a nearby gas station to buy a bottle of soda, leaving his car in the Roy Rogers parking lot.  While returning to his car, he fell on the Roy Rogers parking lot and was injured.  Relying on Levine, inter alia, the defendant moved for summary judgment.

In denying the motion, this Court noted that Maryland has "adopted the Restatement view defining a 'business visitor' as 'one "invited or permitted to enter or remain . . . for a purpose directly or indirectly connected with business dealings between them.'" Bass, 982 F. Supp. at 1044 (quoting Crown Cork and Seal v. Kane, 131 A.2d 470 (1957), quoting the Restatement of Torts, § 332, emphasis added in Bass).  This Court concluded that "a reasonable jury could conclude that Mr. Bass's return to the Roy Rogers parking lot was at least indirectly connected with his business purpose of purchasing chicken, and that Mr.

33

Bass remained within the scope of his invitation to do business with Roy Rogers when he was hurt." 982 F. Supp. at 1044. This Court also noted that Maryland courts have recognized invitee status upon proof of an "implied invitation": "'there are many cases in which an invitation has been implied from the circumstances, such as custom, the acquiescence of the owner in habitual use, the apparent holding out of the premises to a particular use by the public, or simply the general arrangement or design of the premises.'" Id. (quoting Crown Cork, 131 A.2d at 470). This Court found that it was also a factual question for a jury if the plaintiff was led to believe that the plaintiff's use of the parking lot was intended by the defendant. Id.

Here, Plaintiff had been a patron of Seacrets earlier that evening and her friends were still in Seacrets with her hotel key. She was returning towards the spot where Seacrets employees had placed her to wait for her friends. A reasonable jury could find that her purpose in returning to that location was sufficiently related to Defendant's business that she retained her invitee status.

A jury could also conclude that Seacrets did not properly perform the security function it voluntarily assumed. If the jury is convinced that Plaintiff was being attacked for more

than ten minutes in Lot 113, it could also conclude that Seacrets security personnel were derelict in their duty to monitor Lot 113.  Had they been alert, observed the attack, and intervened, the harm suffered by Plaintiff would have been greatly diminished.

While Plaintiff has several substantial hurdles to cross to establish her premises liability claim, the Court cannot deem those hurdles insurmountable at this stage in the litigation. Accordingly, Defendant's motion for summary judgment will be denied as to this claim as well.

**IV. CONCLUSION**

For the reasons stated above, Seacrets' motion for summary judgment will be denied in its entirety.  A separate order will issue.

_____/s/_____
William M. Nickerson
Senior United States District Judge


Dated:  August 7, 2012